Rajiv Dharnidharka (Bar No. 234756)
rajiv.dharnidharka@us.dlapiper.com
Jeanette Barzelay (Bar No. 261780)
jeanette.barzelay@us.dlapiper.com
Lupe R. Laguna (Bar No. 3017156)
lupe.laguna@us.dlapiper.com
**DLA PIPER LLP (US)**
2000 University Avenue
East Palo Alto, CA 94303-2214
Tel:    650.833.2000
Fax:    650.833.2001

Leon Medzhibovsky (pro hac vice)
leon.medzhibovsky@us.dlapiper.com
Matt Ganas (pro hac vice)
matt.ganas@us.dlapiper.com
**DLA Piper LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Tel:    (212) 335-4630
Fax:    (917) 778-8630

Attorneys for Plaintiffs
WALKME LTD and WALKME, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALKME LTD., an ISRAELI company and WALKME, INC., a DELAWARE corporation,<br><br>      Plaintiffs,<br><br>  v.<br><br>WHATFIX, INC., a DELAWARE corporation,<br><br>      Defendant. | CASE NO.  4:23-cv-03991-JSW<br><br>**DECLARATION OF PAUL SENATORI**<br><br>Date:<br>Time:<br>Ctrm:    5<br>Judge:    Honorable Jeffrey S. White<br><br>**[REDACTED VERSION]**<br><br>Action Filed:  August 8, 2023 |

I, Paul Senatori, declare as follows:

1.      The matters stated in this declaration are based on my personal knowledge and I could and would testify competently to these matters.

2.      I am the Senior Manager of Competitive Intelligence at WalkMe.  In this role, I manage competitive intelligence efforts for WalkMe's industry-leading Digital Adoption Platform ("DAP").  I also assist in developing and implementing WalkMe's marketing strategies, including by creating competitive differentiation messaging for use in sales and marketing efforts.  From this experience, I have become knowledgeable regarding WalkMe's business operations, product features and functionalities, and the market for digital adoption and digital transformation software solutions, including WalkMe's competitors in the market, such as Whatfix.

A.      **WalkMe's Proprietary Digital Adoption Platform Software Solutions.**

3.      WalkMe develops propriety DAP software solutions.  WalkMe developed the industry's first DAP product launched in 2012.  DAP software solutions include features layered on top of other software products, apps, or websites.  WalkMe's DAP includes software solutions designed to aid WalkMe's customers' end users (both employees and consumers) in more effectively using their existing enterprise software systems and technology, and enhancing productivity by increasing adoption and use of customers' software systems.

4.      WalkMe commercializes its customizable DAP software to enterprise customers through subscription agreements and related order forms.  The commercial success of WalkMe's cutting-edge DAP software is a function of WalkMe's innovation, substantial research and development, and customizations driven by data and analytics relating to how WalkMe's customers and their employees and customers utilize enterprise software applications.  For instance, for Fiscal Year 2022, WalkMe reported a research and development spend of $59.5 million, which represented 24% of WalkMe's revenue for the same period.

B.      **WalkMe's Subscription-Based Customer Relationships.**

5.      As a dedicated innovator, WalkMe actively takes steps to protect its DAP software. This includes strict confidentiality and restricted use provisions in its subscription-based customer agreements and Terms of Service.  WalkMe's customers may have one or more employees with

-1-

administrative rights to its DAP software, which include the ability to create additional account users subject to the restrictions of their governing subscription agreements and order forms with WalkMe.

6.      Access to WalkMe customer implementations of its DAP software is password-protected.  Each user associated with a given customer account must be issued unique log-in credentials to access the WalkMe DAP implementation made available to, and often customized for, that customer.

7.      I understand that WalkMe has entered into subscription agreements with the following current or former customers: ████, ██████████████████, and ████. True and correct copies of WalkMe's subscription-based services agreements and relevant order forms are attached hereto as Exhibit A (████), Exhibit B (████), and Exhibit C (████). Each of these agreements contains a Confidentiality provision and/or Restricted Use provision that restricts customers from sharing access to WalkMe's Confidential Information and proprietary systems with WalkMe's competitors, like Whatfix. *See* Ex. A (Software as a Service Agreement), § 6.1; Ex. B (WalkMe Master Subscription Agreement), §§ 5.3, 7.1; Ex. C (WalkMe Master License and Services Agreement), §§ 2.3, 13.1, 13.2.

**C.      WalkMe's Terms of Service.**

8.      WalkMe implements Terms of Service, published on its website, which govern the use of certain WalkMe systems and services, including by non-customer end-users.  A true and correct copy of WalkMe's current Terms of Service is attached hereto as Exhibit D.

**D.      Whatfix's Unauthorized Intrusions Into WalkMe's Proprietary Systems.**

9.      In April 2023, WalkMe detected and began to investigate suspicious user activity on its platform originating from its ████ and ████ customer accounts.  The WalkMe platform records session logs of user activity as a feature disclosed and available to customers designed to enhance product functionality and support.  As part of its investigation, I and other WalkMe personnel reviewed the recorded web sessions and activity logs for certain ████ and ████ user accounts and determined that these accounts were being accessed and used in unusual ways.

10.      As part of this investigation, we discovered that several new accounts were created

-2-

for Whatfix employees with ████ and ████ email address extensions.  From our review of the recorded web sessions and activity logs, it became clear that these Whatfix employees intruded upon the WalkMe platform for purposes of gaining unauthorized insight into and copying WalkMe's system features, functionality, and data.

      11.      We discovered that on April 21, 2023, ████ created three new user accounts using ████ email addresses: (1) apoorva.mittal@████.com; (2) sanjna.chebium@████.com; and (3) aman.singh@████.com.  These accounts appear to have been created for three Whatfix employees, including one "Solutions Engineer": (1) Apoorva Mittal, (2) Sanjna Chebium, and (3) Aman Singh.  The Whatfix employees used these specific accounts from April 21 to April 27, 2023, to gain access to a host of confidential and proprietary information, including at least six separate implementations of the WalkMe platform for ████.

      12.      We also discovered three new user accounts associated with the following email address extensions: (1) rbhati@████.com, (2) pprige@████.com, and (3) pbhattacharya@████.com.  From WalkMe's investigation it appears these user accounts were created for and used by Whatfix employees (Rupender Bhati, Paula Prigge, and Priyansh Bhattacharya) from at least March 28 to April 14, 2023 to penetrate the WalkMe platform.

      13.      WalkMe's recorded web sessions and activity logs show that these Whatfix employees utilized the ████ and ████ customer accounts to probe, exploit and compromise various aspects of WalkMe's DAP software systems, targeting workflows, tasks, content, permissions, integration capabilities, and user engagement metrics to gain insights into WalkMe's product and customized user experience.  They also accessed underlying rule configurations driving the workflows and content displayed at customer deployment sites, downloaded data and PDF documents, and accessed supporting documentation to gain a deeper understanding of WalkMe's processes and product.

      14.      Whatfix employees used the ████ and ████ accounts to access numerous features, deployments, and data that would allow Whatfix to gain competitive, proprietary

knowledge and information to which it otherwise would not have access.

15.     The information accessed and explored through the ███ and ███ account intrusions is confidential and proprietary to WalkMe.  The Whatfix employees' improper access of and visibility into such information affords Whatfix a substantial and unfair competitive advantage by enabling Whatfix to, among other things, replicate WalkMe's solutions, features, and customizations and undercut WalkMe with a less costly offering, tailor its product offerings to specific customers based on insights gained, and unlawfully displace WalkMe from its existing customer accounts using WalkMe's own application and data.  In fact, based on feedback from WalkMe's sales personnel and former or potential customers, we understand that price is typically the driving force behind a customer's choice to purchase Whatfix's competing services over WalkMe's.

16.     I understand that Whatfix has stated that the Whatfix employees who accessed WalkMe's platform using ███ and ███ customer account credentials were facilitating the migration of content for these customers from the WalkMe platform to the Whatfix platform. However, WalkMe provides and makes available to customers a tool to be used for migrating customer-owned data to another vendor.  WalkMe's customer migration tool allows for customer-owned data transfers to a replacement platform without any need for WalkMe's competitors to obtain access to WalkMe's proprietary and customized systems.

17.     In addition, based on my personal review and observations of the ███ and ███ account web sessions, Whatfix's employees went far beyond that which could be necessary for the limited purpose of customer-owned content or data migration.   By way of one example, the ███ account issued to Apoorva Mittal was utilized extensively on April 23, 2023, to access numerous functions, programs, and modules within the WalkMe platform that did not contain any actual data that could be migrated.  During just these April 23 sessions, this account was used to access and explore the following WalkMe services: WalkMe Menu Organizer, WalkMe ActionBot, WalkMe Users, WalkMe Workstation, WalkMe UI Intelligence, WalkMe Discovery, WalkMe Organization.  Based on my understanding of the Whatfix product, Whatfix

does not currently have a competitive equivalent to all of these WalkMe services, and could use the knowledge gained from these session to develop equivalent functionality.

18.    Moreover, when creating new user accounts, an account administrator must select the specific environment(s) within the WalkMe platform to which each user will be granted access.  The ██████ account created for Apoorva Mittal, for example, was given access to six different environments of the WalkMe platform provided to ██████.  WalkMe's recorded user sessions and logs relating to Apoorva Mittal's account activities on April 23, 2023 show that this account was being used to access WalkMe's systems on multiple different environments within ██████ WalkMe platform, including WalkMe's Training, Workstation, and Oracle environments.  Yet, I understand that ██████ transition to Whatfix, ████████████ ████████████████████████████████████████████ ██████████████████.  If these ██████ accounts were being created for Whatfix employees exclusively for the purpose of content migration, there would be no reason for Whatfix's employees to be granted access to or to access any WalkMe environment or implementation other than Oracle.

19.    Therefore, from my review of the recorded sessions, the ██████ and ██████ accounts created for Whatfix employees were not being used for content migration purposes. Rather, the recorded user session activities suggest that these accounts were being utilized to gain valuable insights into WalkMe's DAP product and our customer-specific implementations.  In view of the scope and nature of the activities performed using the ██████ and ██████ accounts, Whatfix's employees were able to, among other things, identify specific workflows, tasks, content types, unique digital adoption rules and potential weaknesses or improvements in WalkMe's implementation for those customers.  Such knowledge affords Whatfix a substantial and unfair competitive advantage in terms of the ability to replicate WalkMe's confidential and proprietary information and data in a competing DAP product at a significantly lower cost than WalkMe.

20.    In August 2023, as part of our continuing investigation, WalkMe discovered that two accounts were created on August 5, 2022, through the ██████ customer account

(Aniket.nikam2000@gmail.com, and dipit.sharma@whatfix.com), apparently for two Whatfix employees.  According to his LinkedIn profile, Dipit Sharma is a Whatfix *Product Manager*, with responsibility for Whatfix product design and management.  Typically, Product Managers in the technology and software solutions industry are responsible, among other things, for overseeing the design and development of new product features and capabilities based on customer needs and market trends.  Based on our ongoing investigation, WalkMe believes Mr. Sharma may have accessed WalkMe's platform more than 30 times between September 1, 2022 and August 3, 2023, using ███ a former WalkMe customer as of March 2023, to unlawfully access WalkMe software systems.

21.    WalkMe discovered the existence of Mr. Sharma's account on August 21, 2023, and immediately suspended it.  As we continue to investigate and monitor potentially suspicious customer account activities, WalkMe has discovered that Mr. Sharma has continued to attempt to access the WalkMe platform.  For example, Mr. Sharma appears to have attempted to access the WalkMe platform eleven times as recently as on August 24, 2023.  A true and correct copy of a screenshot showing Mr. Sharma's failed log-in attempts on August 24, 2023 is attached hereto as Exhibit E.

22.    Customer-owned content migration cannot possibly explain why Whatfix's Product Manager, responsible for product design, continued accessing and attempting to access the WalkMe platform via the ███ account in August 2023, several months after ███'s services agreement with WalkMe terminated in March 2023.  I personally reviewed Mr. Sharma's recorded session activities utilizing the ███ customer account.  From Mr. Sharma's account activities, it is evident that he aimed to gain a deep understanding of how WalkMe's DAP product is implemented at this customer's site.  Over the course of many months, he explored various features and functionalities, and appears to have gathered insights into workflows, tasks, and content developed with this customer.  These insights provide Whatfix with knowledge of WalkMe's product features, functionalities, advanced inter-dependencies between different features and DAP capabilities and engineering approaches, which would enable Whatfix to

potentially replicate these aspects in their own competing platform for a fraction of the cost expended by WalkMe.  Furthermore, Mr. Sharma accessed these advanced features and technologies within the context of actual customer data, showing how WalkMe dynamically adjusts to data and end-user interactions with the underlying application.

     **E.**       <u>**Impact of Whatfix's Unauthorized Intrusions on WalkMe's Business.**</u>

     23.     My responsibilities involve tracking WalkMe's competitive performance in the marketplace and understanding the areas in which WalkMe differentiates itself from competing solutions.

     24.     In roughly the last year, around the same time Whatfix employees were illicitly accessing the WalkMe platform, WalkMe estimates that it has lost numerous customer accounts to Whatfix, including at least ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮.  Additionally, since January 1, 2023, WalkMe has lost actual or potential business opportunities directly to Whatfix for the following customers or prospective customers:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





25.    For WalkMe, as a leader in the digital adoption and digital transformation software solutions industry, losing its technical advantage and customer accounts results in immeasurable harm that goes beyond the mere loss of revenue, because customers like ▬▬ and ▬▬ and other customers lost to Whatfix are marquee DAP customers, and frequently referenced as evidence that WalkMe is a pioneer in the DAP market.  Furthermore, these customers are used as customer examples amongst influential industry analysts such as Gartner Group, Forrester and Everest Group as evidence of the adoption of WalkMe's unique and advanced DAP offering.  The

DLA PIPER LLP (US)
WWW.DLAPIPER.COM

effects of customer peer conversations during vendor selection are enormous in the enterprise DAP market, and loss of these customers to Whatfix directly affects downstream business opportunities.  As painful as a "rip and replace" to a competitor can be, it is doubly damaging since it affects both short term revenue (renewals), and long-term market share.  Whatfix also shares these stories beyond customers, including industry analysts, which has an outsized affect on WalkMe's ability to pursue and close new business.

26.     Based on information coming from our sales personnel and customer feedback, we know that price and the technical features and functionality of the DAP software are major determining factors used by customers to select between WalkMe's and Whatfix's competing DAP software solutions.  We have also received feedback that the technical gap between WalkMe's and Whatfix's competing DAP solutions has narrowed considerably within the last year, which is the same period of time that Whatfix employees were illegally accessing WalkMe's DAP software systems.

27.     Based on my monitoring of the competitive landscape and DAP marketplace, I understand that Whatfix has adjusted and set a product roadmap, including in areas that specifically overlap with the features and functionalities accessed by Whatfix during its intrusions into the WalkMe platform.  Some of these features and functionalities include:

- Desktop Studio support
- Multi-app version support
- Enterprise product insights
- Enterprise Guidance Insights
- ISV-Specific Improvements
- SSO Support for user Identification
- Behavior Targeting with cohorts/rules
- Smart Context based upon User Journeys
- Funnel Enhancements
- No Code Template Builder

- Triggers, or Contextual Nudges
- Visual Clues for improved step captures
- Content author journeys
- Surveys (from widgets, via email, reporting and quizzes)
- Desktop search
- Enterprise drill down reports (user properties in enterprise analytics)
- Page-level analytics
- Local vs. Global configurations
- Process/workflow discovery (via AI/ML)
- Content creation automation
- Advanced rules - Smart Walk-Thrus
    - Creating new smart walk-thrus
    - Exploring existing smart walk-thrus and UI
    - Split and Branching Functionality
    - Creating rules with integrated branching
    - Exploring split and branching functionality
- WalkMe Editor - Hovering techniques over tooltips
    - Understanding rule application logic and data dependencies
- Shoutout Feature
    - Exploring shoutout creation objects
    - Examining shoutout editor features
- New Survey Creation
    - Exploring survey tool settings, design elements, features
- Selecting pre-built SmartTip options
- Understanding SmartTip segment assignment
- Exploring element section capabilities
- Investigating jQuery element selector usage for rules

DLA PIPER LLP (US)
WWW.DLAPIPER.COM

- Examining element pull-down rule editor options
- Creating new ShoutOuts
- Accessing ShoutOut templates
- ShoutOut Editor Interface
    - Exploring editor interface, layout, settings, controls
    - ShoutOut Settings and Controls
    - Testing different settings like position, style, buttons, text
- ShoutOut Creation Workflow
    - Moving through ShoutOut creation process
    - Adding content, testing actions
    - ShoutOut Appearance Settings
    - Reviewing appearance, layers, margins, spotlight settings
    - ShoutOut Engagement Settings
    - Looking at timing options and controls definition and data dependency mapping

//
//
//
//
//
//
//
//
//
//
//
//

DLA PIPER LLP (US)
WWW.DLAPIPER.COM

DECL. OF PAUL SENATORI
CASE NO. 4:23-CV-03991-JSW

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 6, 2023 in Portland, Oregon.

Paul Senatori

DLA PIPER LLP (US)
WWW.DLAPIPER.COM