Michael Ng (Cal. State Bar No. 237915)
Michael.Ng@kobrekim.com
Daniel Zaheer (Cal. State Bar No. 237118)
Daniel.Zaheer@kobrekim.com
Kim Kennedy (Cal. State Bar No. 305499)
Kim.Kennedy@kobrekim.com
**KOBRE & KIM LLP**
150 California Street, 19th Floor
San Francisco, CA 94111
Telephone: (415) 582 4800
Fax: (415) 582 4811

James Pooley (Cal. State Bar No. 58041)
James@Pooley.com
**JAMES POOLEY, PLC**
325 Sharon Park Dr., #208
Menlo Park, CA 94025
Telephone: (650) 285-8520

George Stamatopoulos
(Admitted *Pro Hac Vice*)
George.Stamatopoulos@kobrekim.com
**KOBRE & KIM LLP**
800 Third Avenue,
NY, New York 10022
Telephone: (212) 488 1200
Fax: (212) 488 1220

Shangxing (Simon) Lu
(Admitted *Pro Hac Vice*)
Simon.Lu@kobrekim.com
**KOBRE & KIM LLP**
1919 M Street, NW
Washington, DC 20036
Telephone: (202) 664 1900
Fax: (202) 664 1920

*Attorneys for Plaintiffs*
WALKME LTD. and WALKME INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

WALKME LTD., an Israeli company, and
WALKME INC., a Delaware corporation,

Plaintiffs,

v.

WHATFIX, INC., a Delaware corporation,
and WHATFIX PL, an Indian company,

Defendants.

Case No. 4:23-cv-03991-JSW

**SECOND AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

**REDACTED**

Judge: Hon. Jeffrey S. White

Plaintiffs WalkMe Ltd., an Israeli company, and WalkMe Inc., a Delaware corporation (together, "Plaintiffs" or "WalkMe"), by and through their attorneys, bring this Second Amended Complaint ("Complaint") against defendants Whatfix, Inc. and Whatfix Private Limited, a/k/a Whatfix PL (together, "Defendants" or "Whatfix") and allege as follows:

**INTRODUCTION**

1.     This action arises as a result of Whatfix's theft of WalkMe's trade secrets, developed by WalkMe over the course of more than a dozen years of research and development at an expense of hundreds of millions of dollars.  Whatfix's theft—aimed at acquiring technology Whatfix did not and could not build itself—was accomplished through its unauthorized and illegal intrusion into WalkMe's computer systems and its hiring of employees with prior access to WalkMe's confidential information.

2.     WalkMe is the creator of the world's first digital adoption platform, a software platform that works in tandem with other software, applications, hosted services, and websites, and enables WalkMe's customers to more efficiently leverage their technology investments by improving the end user experience and thus driving adoption and utilization of those products.  First launched in 2012, WalkMe's platform guides users through each step of using complex enterprise software applications, helping businesses save time and money, improve user experiences and effectiveness, and maximize return on their investment in technology.

3.     In just over a decade, the digital adoption platform has become an essential tool used broadly across the modern economy.  Leading market analyst Gartner predicts that, "by 2025, 70% of organizations will use digital adoption solutions across the entire technology stack to overcome insufficient application user experiences."  WalkMe's creation of the digital adoption category has given rise to a multibillion-dollar software industry, with more than 16,000 people worldwide identifying themselves as "Digital Adoption Professionals."

4.     Through investment of hundreds of millions of dollars, and the effort of a global staff dedicated to constant product development and improvement, WalkMe has remained the market leader in this product category.  Its platform has been recognized through myriad awards, including InfoWorld's Technology of the Year Award and the Business Intelligence Group's

1     Artificial Intelligence Excellence Award in 2022.

2          5.     WalkMe's success has spawned healthy competition, but, as with many pioneers, it

3 has also brought about copycats. Defendant Whatfix is a lower-end imitator, whose business model

4 is to provide cut-rate software that emulates elements of WalkMe's cutting-edge software, offering

5 fewer features and lesser functionality but at discount prices. Whatfix's tagalong approach has

6 been evident for a number of years, as the introduction of features to WalkMe's product have been

7 followed by attempted facsimiles cropping up in Whatfix's offering. However, due in part to

8 WalkMe's carefully implemented measures to limit access to trade secrets and other information

9 embodied in its product, Whatfix's imitations have trailed WalkMe's software in the breadth of its

10 feature offerings and quality of experience. The measures WalkMe has taken include mandatory

11 legal restrictions setting out the limits and obligations of anyone given access to the system,

12 password controls and security controls that require verification of each user's identity, and

13 operational controls that monitor and record usage of WalkMe's platform.

14          6.     Whatfix has attempted to narrow this functionality gap through its various attempts

15 to gain access to WalkMe trade secrets and ongoing misappropriation of WalkMe's intellectual

16 property. In April 2023, WalkMe's security team identified suspicious usage of its platform and

17 began an investigation. That inquiry revealed that multiple Whatfix employees had created false

18 customer credentials to access confidential, restricted areas of the WalkMe platform. Those

19 employees, who included at least one product manager whose sole job was to design and build

20 Whatfix's copycat product, scoured the details of WalkMe's confidential system. Whatfix's misuse

21 of WalkMe's platform gave Whatfix's employees insight into the inner workings of WalkMe's

22 platform—proprietary information that WalkMe protects as a trade secret. WalkMe's security team

23 subsequently ascertained that Whatfix engaged in similar improper misappropriation of trade

24 secrets using fake accounts from at least two other customers.

25          7.     WalkMe's security system captured hours of Whatfix's improper and

26 comprehensive scouring of WalkMe's key features. Confronted with that evidence, Whatfix has

27 now admitted its misconduct. In a declaration submitted to this Court, Whatfix Product Manager

28 Dipit Sharma confessed that he had a fake account created using a customer's credentials, used

those credentials to "access the WalkMe product to see how a customer would use a … feature," to "look at the WalkMe product as a reference" and to "understand how a user interacted with [a customer's] prior WalkMe user interface."  ECF No. 25-11, ¶¶ 3-5.  "Based on that review," he admits he "modified the preexisting Whatfix user interface to simplify its operation and meet [the customer's] expectations." *Id.*, ¶ 4.

8.      In other words, Whatfix admits that it (a) had a false credential created to allow it to masquerade as a customer, (b) used that fake ID to improperly access the WalkMe platform, (c) obtained access in order to inspect the WalkMe platform to understand the non-public details and technical implementations of the features WalkMe was offering to customers, (d) examined those offerings for the express purpose of using them, and then (e) did, in fact, use them to make improvements to Whatfix's product so that it could meet the expectations of the customer whose business it was hoping to win.

9.      Whatfix's attempts to unlawfully access the WalkMe system continued even after WalkMe notified Whatfix (on June 24, 2023) that it was aware of the breaches and even after WalkMe's original complaint in this case was filed (on August 8, 2023).  On August 24, 2023, WalkMe detected at least eleven attempts by Mr. Sharma to access its systems:

| ↓ DATE | HOST | SERVICE | CLIENT IP | ACCOUNT_NAME | TOKENAPPNAME | @TITLE | EVENT OUTCOME | OKTAOUTCOMEREASON | USER EMAIL | @CLIENT.USERA |
|---|---|---|---|---|---|---|---|---|---|---|
| Aug 24 23:29:40.548 | okta | 182.72.80.166 | okta_prod | Dipit Sharma | | Authentication of user via MFA | FAILURE | INVALID_CREDENTIALS | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:29:28.754 | okta | 182.72.80.166 | okta_prod | unknown | | User login to Okta | FAILURE | VERIFICATION_ERROR | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:29:22.974 | okta | 182.72.80.166 | okta_prod | Dipit Sharma | | Authentication of user via MFA | FAILURE | INVALID_CREDENTIALS | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:29:19.202 | okta | 182.72.80.166 | okta_prod | Dipit Sharma | | Authentication of user via MFA | FAILURE | INVALID_CREDENTIALS | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:29:00.868 | okta | 182.72.80.166 | okta_prod | unknown | | User login to Okta | FAILURE | VERIFICATION_ERROR | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:28:57.524 | okta | 182.72.80.166 | okta_prod | unknown | | User login to Okta | FAILURE | VERIFICATION_ERROR | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:28:51.924 | okta | 182.72.80.166 | okta_prod | unknown | | User login to Okta | FAILURE | VERIFICATION_ERROR | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:28:11.816 | okta | 182.72.80.166 | okta_prod | unknown | | User login to Okta | FAILURE | VERIFICATION_ERROR | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:28:11.456 | okta | 182.72.80.166 | okta_prod | unknown | | User login to Okta | FAILURE | VERIFICATION_ERROR | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:25:48.605 | okta | 182.72.80.166 | okta_prod | unknown | | User login to Okta | FAILURE | VERIFICATION_ERROR | dipit.sharma@whatfix.com | CHROME |
| Aug 24 23:25:48.313 | okta | 182.72.80.166 | okta_prod | unknown | | User login to Okta | FAILURE | VERIFICATION_ERROR | dipit.sharma@whatfix.com | CHROME |

10.     Whatfix's corporate espionage is, among other things, a violation of the United States Defend Trade Secrets Act, the Computer Fraud and Abuse Act, and their California state analogues.

11.     In addition to their intrusion on WalkMe's system and subsequent misappropriation, Whatfix has also misappropriated WalkMe's trade secrets by means of hiring employees who had extensive access to WalkMe's confidential information.  On information and belief, Whatfix has

improperly and illegally obtained WalkMe's trade secrets through both former employees of WalkMe and a former employee of a customer who gathered WalkMe confidential information in anticipation of being hired by Whatfix. WalkMe also brings claims based on false and misleading statements made by Whatfix about WalkMe and its product.

12.    WalkMe recognizes the value of healthy competition and sees the growth of legitimate competitors as validation of the market it created. WalkMe also knows that some competitors will offer inferior products and that some potential customers will be attracted to lower prices for bare-bones systems. But when competition crosses the line into unlawful theft of trade secrets and blatantly false advertising, WalkMe will defend its rights—and does so here.

## THE PARTIES

13.    Plaintiff WalkMe Ltd. is a company organized under the laws of Israel, with its principal place of business at Walter Moses St. 1, Tel Aviv-Yafo, 6789903 Israel.

14.    Plaintiff WalkMe Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

15.    Upon information and belief, Defendant Whatfix, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in this district at 2107 North 1st Street, Suite 450, San Jose, California 95131. On information and belief, Whatfix, Inc. is the wholly owned subsidiary of, and is the United States operating business for, Whatfix PL.

16.    Upon information and belief, Defendant Whatfix PL is a company organized under the laws of India, having a principal place of business in Bengaluru, India.

## JURISDICTION

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because WalkMe's claims arise under the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*), the Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et seq.*) and Section 43 of the Lanham Act (15 U.S.C. § 1125). This Court has supplemental jurisdiction over WalkMe's other claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy under Article III of the United States Constitution as those for which the Court has original jurisdiction.

**VENUE**

18.    Venue is proper under 28 U.S.C. §§ 1391(b) and (c).

**DIVISIONAL ASSIGNMENT**

19.    This is an intellectual property action that has been properly assigned on a district-wide basis under Civil Local Rule 3-2(c).

**FACTUAL BACKGROUND**

**A.  WalkMe's Digital Adoption Platform and Embedded Trade Secrets**

20.    Modern business is run on enterprise software, a category of computer software that has automated functions ranging from human resources (or HR) to sales to communications to accounting. Enterprise software providers like Salesforce, Oracle, Workday, ServiceNow, Microsoft, and SAP have created powerful tools that allow workers to be more productive, adoption of which has helped drive the growth of the global economy.

21.    But those systems are also complex.  They have hundreds or thousands of features, evolve frequently and on an ongoing basis (unlike desktop or installed software which typically is updated only every two or three years), and are customized for each company that uses them, including differentiation for different areas within each company and different functions within each area.  Companies typically invest heavily in acquiring their enterprise software systems, but to effectively utilize their full functionality must put in further time, effort and expense to help employees understand the details of how to use those complex systems, which functionalities are relevant to an employee's work, how an employee can derive the most value from the software, and how an employee can quickly adopt and begin to use new or revamped features.  They also expend untold amounts on internal-facing information technology teams who review, respond to, and resolve requests for help from employees struggling with use of these third-party applications.

22.    WalkMe was founded in 2011 to help customers do all of those things, and to do them better and more efficiently.  It created a new type of software product that provides "in-app" guidance which allows people to interact more effectively with technology.  Its concept, the digital adoption platform, is to sit on top of enterprise software applications and assist users of the underlying applications in "real time," and it allows businesses to create their own tailored

1   assistance for users to show them how that company uses the application.

2       23.     WalkMe's initial version of the digital adoption platform offered on-screen

3   guidance that walked users through interactive technology systems, including step-by-step

4   instructions called "Smart Walk-Thrus" that took users through each aspect of the system.

5   WalkMe's platform provided users with training, guidance on the sequence of processes,

6   instruction on the type of information required, and hints when users got stuck at any point.

7   WalkMe's platform has evolved well beyond that initial offering, to include a comprehensive suite

8   of help businesses leverage the full capabilities of their technology stack. WalkMe's powerful data

9   analytics help companies optimize usage and maximize the return on their investment in

10  technology, and automation of workflows further reduces the need for hands-on training. As

11  enterprise software has become more complex, pervasive, and deeply embedded in how businesses

12  run, WalkMe has grown alongside, evolving into a complex tool that has become essential to

13  ensuring the operation of businesses that rely on such enterprise software (hereinafter referred to

14  as "target applications").

15      24.     A key aspect of the WalkMe platform is that it can be used with virtually any target

16  application, including custom implementations configured for particular customers. WalkMe's

17  platform also can be easily tailored by businesses to reflect how they have decided to implement

18  the target application to improve business processes or workflow adoption. WalkMe's platform is

19  sometimes analogized to a contact lens—it is separate from and sits on top of the underlying target

20  application but helps bring it into focus. WalkMe content is delivered to users as overlays on a

21  particular customer's underlying target applications, such as Salesforce or Workday. WalkMe's

22  platform is designed so that the customer does not need to coordinate in advance with the enterprise

23  software provider or access the code underlying the enterprise software itself—the WalkMe

24  platform adapts to how users interact with the enterprise system and can be tailored to a wide variety

25  of uses.

26      25.     An essential part of WalkMe's platform is the constantly evolving "no-code" tools

27  WalkMe has developed to allow non-technical personnel to design in-application guidance for other

28  users. An HR manager, for example, might create a Smart Walk-Thru for new hires to input needed

personnel information into the company's payroll system. That "implementation" could start with simple help for the entry of basic information, like pop-up bubbles to explain what needs to be input in each field, and could be expanded to take the new hire through each step of the onboarding process, even jumping seamlessly between different third-party target applications. The WalkMe platform can monitor where users run into trouble, provide feedback to the HR team, and allow them to modify the guidance as necessary. WalkMe's Editor tool allows all of that to be done by staff who have no training in computer programming. All of WalkMe's tools are designed to be user-friendly and intuitive, and WalkMe invests heavily in constant improvement to ensure that WalkMe's tools are user friendly and contribute to productivity—all to help people work efficiently and effectively on other systems.

26.     The ease of functionality for WalkMe's customers and the massive savings in time and effort enabled by WalkMe's platform are the result of more than a dozen years of learning, research and development and the effort of hundreds of WalkMe employees who have been dedicated to the constant improvement of its tools. That effort and the resulting improvements are possible only because WalkMe has unique access to how its customers interact with its tools and the underlying target applications. Drawing from millions of such interactions, WalkMe has integrated the insights and learnings gained through that constant process of evaluation into the structure, functionality, configuration, algorithms, and other design elements of its system. In other words, the elegant simplicity of the WalkMe platform is constructed on a massive foundation of experience, proprietary data, and know-how carefully developed through WalkMe's real-world experience in the market the company itself created.

27.     That effort has required hundreds of millions of dollars in investment, and the results consist of a body of carefully-guarded proprietary information. The company places strict limits on access to its proprietary information underlying the insights and learnings that go into its system designs. But beyond that, the design, configuration, operation, features, and particular details of WalkMe's system, as well as the learning applied to each customer's unique implementation, reflect WalkMe's proprietary insight and constitute highly confidential information that derives value from being kept secret from competitors. Of course, the basic design and features of the

system are accessible to users, but WalkMe goes to great lengths to ensure that they are appropriately restricted from competitors, who, if allowed to access them, would unfairly gain the benefit of WalkMe's investment, efforts and unique access to customer interactions. Other WalkMe information and tools are even more closely guarded, such that access is restricted to "administrator" level users.

28.    WalkMe's efforts to protect its proprietary information include legal, operational, and technical safeguards. For example, all WalkMe employees are subject to confidentiality agreements that preclude them from disclosing such information outside of the company, are trained on their confidentiality obligations at the time of hire and are reminded of those obligations regularly and in the WalkMe Employee Handbook. The proprietary information at issue is provided to third parties only under confidentiality and other contractual restrictions commensurate with business needs. WalkMe's content creation and analytics tools themselves (including the "WalkMe Editor" and "WalkMe Insights") are accessible only to authorized administrative users, and the company implements multiple security controls to detect and prevent unauthorized access.

29.    Whatfix's attempts to emulate WalkMe's product go back many years. Several years after WalkMe's launch, Whatfix first appeared on the scene with a bare-bones offering, of the type sometimes referred to in the industry as a "basic bubble" product. Since then, Whatfix has continued to occupy the cut-rate end of the market, offering a cheaper though less robust digital adoption tool. For years, Whatfix has attempted to copy new WalkMe features as they become public, though without the full functionality of the original. For example, WalkMe's patented DeepUI technology monitors changes in underlying target applications and modifies customers' guidance automatically, preventing downtime and the need for costly updates by customer staff. Realizing the benefits of the feature, Whatfix has attempted to duplicate it using a brute-force approach, with teams of staffers monitoring changes in common enterprise software and making adjustments to the WhatFix product manually.

**B. Whatfix's Unlawful Intrusions into WalkMe's Proprietary Systems**

30.    Despite WalkMe's diligent efforts to maintain the secrecy of its information, Whatfix has repeatedly, deliberately, and illegally circumvented WalkMe's controls to gain access

to WalkMe's proprietary systems.  By doing so, Whatfix has been able to observe WalkMe's trade secrets, for the express—and now admitted—purpose of copying WalkMe's features, designs and functionalities.  Whatfix has used WalkMe's trade secrets to improve Whatfix's copycat product, including by making it more attractive to potential customers by undercutting WalkMe on price (something they would not be able to do if they were investing in a comparable level of research and development as WalkMe).

31.    Beginning no later than August 2022, Whatfix employees accessed WalkMe's system under false pretenses, and systematically catalogued proprietary and confidential information regarding the functionality, configurations, structure, features, data schema, and other details of the WalkMe system (as described in detail in section C, below).  Each of those individuals were, on information and belief, employed by Whatfix PL, and acted on behalf of and for the benefit of Whatfix PL and Whatfix, Inc., and each accessed WalkMe's system by way of false user accounts purporting to be created for WalkMe customers.[1]

32.    On or around April 21, 2023, Whatfix created or had created for it three new WalkMe user accounts using the email domain of an existing WalkMe customer ("Customer X").  Those three accounts were set up with email addresses that appear to use the actual names of Whatfix employees Apoorva Mittal, Sanjna Chebium, and Aman Singh.  The creation of those accounts was not allowed under the customer's contract with WalkMe or otherwise authorized in any way.

33.    WalkMe's activity logs and recorded web sessions (i.e., video captures of Whatfix's activities on WalkMe's platform) show that users of those fake accounts improperly accessed WalkMe's system on multiple occasions between April 21 and April 27, 2023, and that they gained unauthorized access to confidential, trade secret, commercially sensitive, and proprietary

---

[1]    The Court's March 21, 2024 decision dismissed certain of Plaintiffs' claims with leave to amend.  While Plaintiffs have not amended and do not intend to amend a subset of those claims, Plaintiffs have retained in this Second Amended Complaint certain allegations and elements of claims that may have been previously dismissed strictly to preserve them for appeal.  *See*, *e.g.*, *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1274 (9th Cir. 2017) (plaintiff's failure to replead a claim that was dismissed with leave to amend "effectively abandoned" the claim).

information.  Those users accessed Customer X's target application implementations of WalkMe, reviewing the detail of how the customer's guidance was configured within the WalkMe system. Though not authorized or allowed, Whatfix now claims that such access was for the purpose of helping partially migrate the customer to the Whatfix platform.  But WalkMe provides a separate tool specifically for such migration that prevents unauthorized access, negating the need for any such access for those purposes.  Whatfix's hackers also accessed parts of the WalkMe system that contained no information relating to the customer, but instead contained the tools that WalkMe provides to customers to allow them to develop and consume content.

34.    In connection with its investigation of that first-identified intrusion, WalkMe detected another suspicious account similarly originating from an IP address also geolocated in India but allegedly associated with a second WalkMe customer ("Customer Y").  On further inquiry, WalkMe found a total of three accounts that it believes were created by or on behalf of Whatfix employees Rupender Bhati, Paula Prigge, and Priyansh Bhattacharya.

35.    WalkMe's activity logs and recorded web sessions show that those users accessed WalkMe's system on numerous occasions from at least March 28 to April 14, 2023, and that they gained unauthorized access to confidential, trade secret, commercially sensitive, and proprietary information. Those users extensively explored myriad aspects of WalkMe's systems, targeting workflows, tasks, content, permissions, integration capabilities, and user engagement metrics that allowed them to learn confidential details about WalkMe's product and customized user experience.  The Whatfix users also accessed underlying rule configurations driving the workflows and content displayed at customer deployment sites, downloaded PDFs, and accessed supporting documentation to gain a deeper understanding of WalkMe's processes and product.

36.    Since filing this suit, WalkMe has discovered an additional intrusion by two more Whatfix employees.  As early as August 5, 2022, Whatfix employees Aniket Nikam and Dipit Sharma, or those acting on their behalf, accessed WalkMe's systems using false accounts purporting to be for a third WalkMe customer ("Customer Z").  Mr. Sharma accessed WalkMe's secure platform at least 21 times between September 1, 2022 and August 3, 2023 using the false credentials.  WalkMe discovered the existence of the fake account and immediately suspended it,

but Mr. Sharma appears to have attempted to access the WalkMe system eleven additional times on August 24, 2023.

37.    Through his illicit access, Mr. Sharma made use of a variety of WalkMe tools and features including the WalkMe Editor and multiple features of that tool.  Not only did Mr. Sharma view these features, he thoroughly experimented with them, gaining improper understanding of their functionality that would be inaccessible from public materials.  For example, during his illicit access of the WalkMe Editor on June 21, 2023, Mr. Sharma experimented with the use of the ShoutOut Designer feature, thereby improperly gaining knowledge as to the look, feel, and operation of the feature for Whatfix to copy.  Similarly, during his improper access of the WalkMe Editor on July 31, 2023, he applied different configurations to the Element Selector tool discussed below, improperly learning how these settings impacted the functionality of that tool.  He went on to explore the Rule Engine extensively, looking at all of the different combinations of options within the Editor that are available to the customer.  These actions are inconsistent with any conceivable legitimate reason for accessing the WalkMe software and instead show Whatfix's intent to gain an improper competitive advantage by misappropriating WalkMe's trade secrets.

38.    In a sworn declaration submitted in connection with this litigation, Mr. Sharma admitted the extent of his wrongdoing, including his accessing of the WalkMe system using fake customer accounts at "some point in August or September 2022."  ECF No. 25-11, ¶ 3.  He stated that he was at the time employed by Whatfix PL as a Product Manager, and that his "current responsibilities involve evaluating customer needs, setting a vision for the company's product, and managing the development of new products and features."  *Id.* at ¶ 2.  He further declared, "I also perform competitive analysis to learn of features and capabilities of our competitors' products."  *Id.*

39.    Mr. Sharma admitted that the purpose of his illegal intrusion was to learn about WalkMe's technology in order to improve deficiencies in the Whatfix system—i.e., to misappropriate WalkMe's trade secrets.  He said that one customer told Whatfix that "certain functionality of the Whatfix user interface was difficult to use," and that "[o]ther customers had previously pointed to difficulties with this aspect of Whatfix's offering."  *Id.* at ¶ 4.  In order to learn how WalkMe overcame those difficulties, and for the express purpose of using the "WalkMe

product as a reference," he and Aniket Nikam used false customer credentials to access the WalkMe system, "to understand how a user interacted with" the customer's "WalkMe user interface," and that based on that learning, "we modified the preexisting Whatfix user interface to simplify its operation" and to meet the customer's expectations. *Id.*

40.    He further admitted to an additional intrusion in July 2023, carried out "in order to perform competitive analysis." *Id.* at ¶ 5. In that hack, he "access[ed] the WalkMe product to see how a customer would use a 'logic rules' feature in WalkMe's product." *Id.* He admitted that he further attempted to access the WalkMe system on August 24, 2023, but was unable to do so. *Id.* at ¶ 6. He stated that while his intrusions were carried out on behalf of and for the benefit of Whatfix, he had not previously been made aware of any company policy against such unlawful conduct. *Id.* at ¶ 7.

41.    WalkMe's recorded web sessions and activity logs reveal a shocking breadth of trade secrets accessed by Whatfix's unauthorized hackers. Access to those features, deployments, and data allowed Whatfix to gain competitive, proprietary knowledge and information to which it otherwise would not have access, including the details of WalkMe's tools, product design, logic, operation, workflows, content, and functionality, as well as how those are implemented for customers including configurations, workflows, and content structuring.

42.    Those tools are critical to the WalkMe product, and the result of hundreds of millions of dollars of investment in innovation and careful analysis by hundreds of employees of how its tools have been used by thousands of customers. Much of WalkMe's success as the leading digital adoption platform depends essentially on WalkMe's unique, non-replicable, real-world advantage: WalkMe, and only WalkMe, has access to the millions of individual interactions its customers' users have had with its system over more than twelve years, through which WalkMe can extrapolate learning, and through iterative machine learning and artificial intelligence incrementally improve its platform.

43.    All of the above-described intrusions by Whatfix were expressly prohibited under the terms of WalkMe's agreements with its customers and were accomplished in knowing violation of the terms of use of WalkMe's system, carried out under false pretenses, and otherwise

unauthorized and unlawful. The intrusions targeted WalkMe's information and business located in this district, in California, and were purposefully directed toward information and the business located here. All of these actions were carried out by employees of or on behalf of both Whatfix defendant entities.

44. Whatfix has since admitted that what it did is wrong. After WalkMe notified Whatfix that it had detected some of the unauthorized intrusions, Whatfix CEO Khadim Batti issued an announcement to the company dated September 7, 2023, in which he "ma[de] clear that attempting to access non-public information from our competitors using customer accounts or any unauthorised means for competitive analysis or development purposes is not acceptable and not consistent with [Whatfix's] values as a company." ECF No. 25-8. Mr. Batti directed that the Whatfix "Product, R&D and Competitive Analysis teams must not access, or try to access, non-public competitor information by logging in to WalkMe webpages or other resources using customer accounts or any unauthorised means." *Id*. In other words, the company's CEO clearly stated that what his own employees had already admitted to doing was improper.

**C. WalkMe's Trade Secrets Misappropriated via Whatfix's Unlawful Intrusions**

45. WalkMe's commercial success is built on its leading-edge product, which reflects more than twelve years of WalkMe's intensive research and development, its systematic analysis of how customers have interacted with its digital adoption platform over millions of iterations, careful testing of proposed features and improvements over years of deployment in myriad environments, and integration of customer feedback. WalkMe has spent hundreds of millions of dollars on improving its product—as a publicly traded company, it reported that it spent $59.5 and $55.1 million on research and development in fiscal years 2022 and 2023 alone, representing approximately 24% of its revenues.

46. The commercial success of WalkMe's cutting-edge, proprietary digital adoption platform is a product of WalkMe's innovation, substantial research and development, and customizations driven by data and analytics relating to how WalkMe's customers and their employees utilize (and under-utilize) target applications and how to build guided processes to help end users utilize those systems more effectively and efficiently in real time.

47.     As the leading innovator in the digital transformation and digital adoption industry, WalkMe actively takes steps to protect and maintain its valuable intellectual property, including the confidential and proprietary trade secrets that give it a competitive advantage in the marketplace.   For example, WalkMe's customer subscription agreements contain strict confidentiality and non-disclosure provisions designed to guard against public disclosure and misuse of WalkMe's confidential, proprietary, and commercially sensitive data and information.  Additionally, WalkMe's customer subscription agreements and/or Terms of Service contain Restricted Use provisions designed, in part, to prevent improper access to and use of the WalkMe platform.

48.     WalkMe's customers are granted authorization to access and use WalkMe's proprietary tools, functionalities, and data, in exchange for a software subscription and licensing fee and under strict confidentiality and use restrictions intentionally designed to prevent competitors like Whatfix from accessing and misappropriating such confidential and proprietary information.

49.     Access to the WalkMe Editor, WalkMe Insights, and other content creation and administrative tools described below, requires additional levels of permissions and visibility from WalkMe.  On repeated occasions, Whatfix illegally gained access to the WalkMe Editor and other tools through the use of false customer accounts.  Once inside the administrative user portion of the WalkMe platform, Whatfix operatives had access to all of the features and functionalities of the platform which would aid Whatfix in reverse engineering WalkMe's proprietary algorithms, business logic, data schema, and know-how.

50.     WalkMe specifically identified a handful of intrusions using falsified accounts generated from the WalkMe customers identified above.  However, upon information and belief, these specific intrusions do not cover the full extent of Whatfix's illegal access to WalkMe's proprietary software, including the WalkMe Editor.  Upon information and belief, Whatfix had plenary access to WalkMe's proprietary software through the intrusions.

51.     WalkMe provides different types of functionality to different segments of users.  "End users" are not granted access to the WalkMe Editor or to WalkMe Insights, or to administrative

1    features and are only exposed to WalkMe *content* delivered as overlays on a particular customer's

2    underlying target application, such as Salesforce or Workday.

3        52.    On the other hand, a small number of a customer's employees are granted

4    administrative access to the WalkMe content creation, analytics, and other administrative tools

5    (including WalkMe Editor and WalkMe Insights) and these administrative users in turn create the

6    overlays and in-app guidance to which end users are exposed.  These content creation and data

7    analytics tools rely on WalkMe's business intelligence, know-how, proprietary algorithms, and

8    complex machine learning models to enable the seamless and no-code creation of in-app guidance

9    for end users.  As seen in the images below, the functionality of WalkMe content viewed and

10   consumed by an end user is very different from the functionality available to administrative users

11   in the WalkMe Editor.  The End-User View shows an example of what an employee (end user) of

12   a hypothetical WalkMe customer company might see when creating a new opportunity in

13   Salesforce.  The blue circles adjacent to various entry fields indicate where the hypothetical

14   customer company has used WalkMe to offer in-app guidance to ensure the user is able to complete

15   the form correctly and in accordance with company policy.  The WalkMe Editor View shows an

16   example of what an administrative user of the same hypothetical customer company might see

17   when creating that type of in-app user guidance.

18   **End-User View**

19

20



21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT
CASE NO. 4:23-CV-03991-JSW

**WalkMe Editor View**



53.    Importantly, as discussed above, WalkMe content (which is the result of WalkMe algorithms) is overlaid on customers' target applications.    The WalkMe Editor allows administrative users to precisely place on-screen guidance (e.g., pop-ups called "ShoutOuts," field-specific "SmartTips" in a form, detailed "Walk-Thrus" for a multi-step process) to the customer's specific implementation and version of the target application.    The end result is that customer's end users are guided through a business process as if an expert was personally walking them through it, and this is all accomplished through the WalkMe Editor in a way that does not require administrative users to write a single line of code.

54.    In addition, the WalkMe Editor automates conditional behaviors in the content to account for target application variations such as: (1) variability between different target applications and in different deployments of the same application from customer to customer, creating a near-limitless number of targets to which the digital adoption platform must be able to instantly and (from the customer's perspective, effortlessly) adapt; (2) software updates to the target application, including updates to the user interface, (3) maintaining precise placement over different screens, screen sizes, browsers, and operating systems, (4) handling unexpected, and sometimes counter-intuitive, use cases for the target application, (5) identifying the relevant end users of the target application, (6) identifying the correct page and form of the target application, (7) storing attributes

of the end user, such as his or her role in the company as well as whether he or she has used the target application previously, thereby allowing WalkMe to provide only relevant content to each end user, and (8) detecting the end user's language preference, such as English or Hebrew, so that appropriate WalkMe content is displayed.

55.    By way of example, Workday, a common target application used by many WalkMe customers, has changed its user interface multiple times in the last few years, as seen below.



WalkMe's technology is so innovative that it works without any input or updates from Workday regarding its constant iterations, and without access to Workday's code.  WalkMe thereby makes Workday far easier to use than without WalkMe.

56.    WalkMe solved these challenges through its years of experience and work with customers, using WalkMe's proprietary software in real-world implementations, collecting analytics and feedback, and constantly adjusting, evolving and innovating WalkMe's software to work more effectively under the vast array of circumstances presented to its customers.  Success in the digital adoption platform market requires the high level of automation, adaptability, and predictive capabilities that have been developed and engineered by WalkMe.  These efforts resulted in a rich body of trade secrets for implementing particular steps in specific process flows in commonly-used customer target applications.  These implementations are essential to the product behaving in a way that is useful for the customer and does not crash, freeze, or otherwise behave in

a manner that is confusing. For example, application of these trade secrets ensures that user-facing material such as pop-ups, buttons, and text appear in the appropriate place on the page and at the appropriate time in the end user's interaction with the underlying target application.

57. At a more granular level, the WalkMe trade secrets at issue in this case are the product of more than twelve years of development and incremental work. Specifically, the WalkMe Editor includes pre-configurations, default settings, algorithms, templates, and a robust data scheme that enable administrators to design content without having to worry about the technical challenges of implementing the right steps required for a specific workflow in a particular target application. WalkMe also designs and implements custom solutions for its customers and provides customer guidance in the form of best practices that reflect the years of trial and error and learnings about how WalkMe's overlay can be configured to work correctly with different target applications. These trade secrets are kept confidential by WalkMe and are presented only to customers to aid in their implementation of the software. The following is an exemplary list (further expanded on in Exhibit A) of these pre-configurations, tools, and other solutions which are trade secrets that Whatfix misappropriated through its intrusions into WalkMe's system:

    a. **Default Configurations in WalkMe Editor.** WalkMe has developed default configuration settings and related know-how that are implemented via the WalkMe Editor, to which a limited subset of customer personnel have restricted access and which are subject to confidentiality restrictions as described herein. Examples of Whatfix's improper access to WalkMe's Default Configurations trade secrets are set forth in Items #4 and #16 of Exhibit A. One example is the specific settings, for specific target applications, for particular users, in particular steps of particular Walk-Thrus, in the "Selected Element" tool:

        **(i)** The "Selected Element" tool includes three options: (1) automatic selection, (2) text-based selection, and (3) JQuery selection. These options each select in a different way the underlying element of the target application on which WalkMe guidance will focus, ensuring the WalkMe pop-up or in-app guidance appears in the right position

SECOND AMENDED COMPLAINT
CASE NO. 4:23-CV-03991-JSW

for viewing by the end user. In most instances, WalkMe's technology automatically recognizes the relevant user interface element of the underlying target application, along with its placement and other key attributes, in order to select the optimal settings in the WalkMe Editor for each Selected Element (automatic selection); however, in some instances, text-based or JQuery selection may be more appropriate, e.g., to implement complex logic. WalkMe's determination of the proper method of selecting an element for particular Smart Walk-Thru steps for a particular target application reflects years of learning and know-how, all of which is maintained as a trade secret, including the default selection itself.

(ii)     The "Selected Element" tool further includes options to determine which attributes of the underlying element of the target application to ignore. These include (1) text within the underlying element, (2) the element ID, and (3) the position of the element. By selecting appropriate elements to ignore, the system ensures that the WalkMe-generated overlay will not be accidentally placed incorrectly on the screen due, for example, to changing attributes of the underlying element. Through a combination of default settings, best practice guides, and guidance from WalkMe staff, WalkMe implements the optimal selection of attributes for customers. WalkMe's determination of the proper attributes of the element of the underlying target application to ignore in various circumstances reflects years of learning and know-how, which is all maintained as a trade secret, including the selection of these attributes itself.

(iii)     The "Selected Element" tool also provides a "Precision Level" option that determines the precision with which the element on the underlying target application can be identified. Options include high,

medium, and low precision.  Through a combination of default settings and guidance from WalkMe staff, WalkMe implements the optimal selection for this tool for customers.  WalkMe's determination of the precision with which to select an element in a particular target application reflects years of learning and know-how, which is all maintained as a trade secret, including the selection itself.

**(iv)**  When the "Selected Element" tool is set to JQuery selector, the WalkMe software uses the JQuery method of JavaScript to identify the underlying element on the page. ████████████████ ████████████████████████████████████ ████████████████████████████████████ ███████████████████████ WalkMe provides these options and guidance based on years of learning the optimal implementation strategies for numerous target applications.  This is all maintained as trade secrets, including the selection mechanism itself.

**b. WalkMe-Generated Algorithms.**  In many instances, WalkMe uses a combination of its tools within the WalkMe Editor to generate algorithms for its customers.  These algorithms can include, for example, complicated logic or rules generated in the WalkMe Rule Engine, specific to unique technical challenges posed by underlying target applications or their use.  These rules can include specific implementations of an attribute of a WalkMe guidance indicator (such as whether a step is skippable), settings to identify appropriate URLs, as well as logical structures for the algorithm like segmenting, branching, and conditioning.  They can also include combinations of these steps and rules, leading to a broader configuration generated on behalf of a WalkMe customer.  These rules were developed by WalkMe after years of identifying usage and implementation challenges and developing appropriate solutions in the underlying platforms and are maintained as trade secrets.  Examples of Whatfix's improper access to

WalkMe's Generated Algorithm trade secrets are set forth in Item #92 of Exhibit A.

    **c.** **Templates.** WalkMe provides authorized administrative users with an expansive library of templates showing sample feature designs, such as for "ShoutOuts." These preconfigured options provide WalkMe customers with vetted templates to use when creating end user workflows. Because each template embodies and reflects a unique use case researched and developed by WalkMe, access to information concerning the templates would enable a competitor to obtain a head start on development of new product use cases, implementations, and features. A competitor could therefore use access to the information to leverage WalkMe's functional implementation expertise and to mimic WalkMe's overall user experience. The information is kept confidential in the WalkMe Editor and reflects years of WalkMe learning from working with customers on specific implementations and identifying their preferences. Examples of Whatfix's improper access to WalkMe's Template trade secrets are set forth in Item #124 of Exhibit A.

    **d.** **Data Schema.** Within the WalkMe Editor, WalkMe utilizes a complex schema of data types, which it maintains as a trade secret. Some examples include: (1) attributes regarding target application characteristics, such as version number, page type, form title, environment type, and use case; (2) attributes regarding end users, such as the end user's job function and the number of times the end user has previously used the target application; (3) attributes regarding field validation requirements, such as the specific format – number of characters, use of symbols, etc. – that is required for a field in one target application versus the specific format required for the same field in another target application (for example, whether a phone number requires a country code or may contain dashes); and (4) relational data that reflects logical connections (such as groupings or dependent logic) between and among various data types. This body of information allows

SECOND AMENDED COMPLAINT
CASE NO. 4:23-CV-03991-JSW

administrative users of the WalkMe Editor to efficiently deliver content tailored to specific employees within an organization at the right time and in the optimal location, all within the employee's natural flow of work. This schema of data types, including WalkMe's selection and design of the schema as a whole, as well as the details of the individual data types, is the product of years of WalkMe learning, design and know-how. WalkMe maintains this information as a trade secret; it is accessible only through secure access to the WalkMe Editor, and within the WalkMe Editor, it is protected in the following ways: (i) the complete schema is never displayed in the user interface; and (ii) the comprehensive details of the individual data types are neither displayed nor documented, rather, only on a specific element-by-element basis, individual data items might be viewable because (a) they are incorporated into WalkMe's logic statements, templates, etc. or (b) a subset of specific, related data items may be made available for selection in the process of building custom logic statements or customizing a template. Examples of Whatfix's improper access to WalkMe's data schema trade secrets are set forth in Item #123 of Exhibit A.

58.     Whatfix's improper access to WalkMe's software also allowed Whatfix to obtain confidential information concerning WalkMe's Insights analytics tool, which reflects years of extensive development, trial and error, and incremental learnings. WalkMe's Insights analytics tool enables customer administrative users to add another layer of usage data and visualization to the data schema used by the WalkMe Editor, resulting in a comprehensive and actionable analytics product that allows WalkMe's customers to continuously and efficiently improve their WalkMe implementations and ensure effective usage by end users in alignment with their particular business objectives. For example, the Insights tool makes it possible for a customer's administrative user(s) to focus their process improvement efforts on the WalkMe content that is the most viewed, or on the workflows with the greatest number of incomplete submissions. Furthermore, WalkMe's Insights analytics tool has opened the door to an expanded market of new customer use cases, such as enterprise software manufacturers who have elected to use WalkMe's Insights in conjunction

with other WalkMe services to better manage their own beta testing programs for their new products. As with the data schema in the WalkMe Editor, the data selection, the tracking and organizational methodology, and the visualization and report-building capabilities that are utilized by WalkMe's Insights analytics tool represent an extensive investment of time, research, and know-how. This body of logic and analytical functions is maintained by WalkMe as a trade secret and is accessible only through secure access to the WalkMe Insights analytics tool, and even then only as specific, discrete visualizations and reports, or as raw data exported without the related logical framework. Examples of Whatfix's improper access to WalkMe's Insights-related trade secrets are set forth in Item #117 of Exhibit A.

59.    As a result of the unauthorized intrusions described here and, on information and belief, through other improper means as well, Whatfix has without authorization acquired WalkMe's trade secrets, described above as well as in Exhibit A, knowing them to be obtained without authorization.

60.    Whatfix's intrusions into WalkMe's system allowed it to conduct a broad and in-depth review of the operation and interrelations of a vast array of attributes of WalkMe's platform. The configurations, algorithms, attributes, and information in the WalkMe Editor and the WalkMe Insights analytics tool described above and shown in Exhibit A each individually comprises a trade secret misappropriated by Whatfix, and those—along with the additional information Whatfix obtained via the intrusions, as depicted in the video captures—in combination are secret, confidential, and highly valuable to a competitor in the digital adoption platform market. This information provides a roadmap to delivering the user experience customers insist upon and which WalkMe has consistently delivered.

61.    WalkMe's security measures recorded the video captures of Whatfix's employees gaining unauthorized access to the trade secrets described above and in Exhibit A during multiple intrusion incidents, including through fictitious customer accounts, as a means to gain unauthorized access to and use of the WalkMe Editor and the WalkMe Insights analytics tools. However, Whatfix engaged in other intrusions that were not captured in the videos. The videos themselves reflect that the six Whatfix employees captured on the videos improperly accessing WalkMe's

platform did so across 348 distinct sessions, comprising many hours of extensive, broad, and in-depth review of WalkMe's trade secrets. The videos do not capture all 348 sessions and there may be other improper review sessions by Whatfix which were not detected or recorded by WalkMe. Whatfix therefore likely has misappropriated trade secrets not described in this Complaint or in Exhibit A.

62. On information and belief—including that based on WalkMe's review of Whatfix's subsequent offerings and announcements—Whatfix has used the misappropriated information to inform the development of its own digital adoption platform, including features that attempt to mimic those offered by WalkMe.

**D. WalkMe's Trade Secrets Misappropriated Through Whatfix's Hiring of Employees with Prior Access to WalkMe's Trade Secrets**

63. In recent years, it has been reported that Whatfix has acquired additional investment funding and has aggressively grown its sales team in an effort to expand its market share. That expansion has included the targeted hiring of WalkMe employees, including employees from WalkMe's account management, product development, and technical review teams. On information and belief, those former WalkMe employees have used their knowledge of WalkMe's confidential information and internal processes to help Whatfix market to WalkMe customers and develop product features previously available only from WalkMe.

64. In addition to misappropriation by means of its intrusion into WalkMe's system, Whatfix has misappropriated WalkMe's trade secrets through individuals hired by Whatfix. On information and belief, Whatfix hired those persons with knowledge of their access to WalkMe's trade secrets, but in any event Whatfix clearly understood that it was not entitled to acquire WalkMe's confidential information from those individuals, and that any receipt, use or disclosure of such information was improper. These individuals include (a) former employees of WalkMe with possession of highly confidential trade secrets, and (b) at least one former employee of a WalkMe customer, who obtained WalkMe's trade secret information by virtue of her status as an employee of, and WalkMe Champion within, that customer, including (on information and belief) information expressly requested for the purpose of sharing and using it at Whatfix. As a result of

this misappropriation, WalkMe has been harmed, including by Whatfix's ability to speed its development, improve its ability to win customers, obtain know-how it was otherwise unable to obtain, save on development costs, and otherwise unfairly gain a competitive advantage.

65.     For example, in January of 2023, Whatfix hired Kate Frasca as a Digital Adoption Platform Strategist.  Before being hired by Whatfix, Ms. Frasca was a Digital Adoption Platform Consultant at WalkMe.  Ms. Frasca had worked at WalkMe for over six years before leaving in January 2023.

66.     On information and belief, Whatfix specifically targeted Ms. Frasca for hiring in order to improperly gain access to WalkMe's confidential trade secret information, but at a minimum with knowledge of the fact that she possessed such information, and that such information could not properly be acquired by, used by or disclosed to anyone at Whatfix.

67.     On information and belief, Ms. Frasca gathered WalkMe confidential information including WalkMe trade secrets in anticipation of being hired at Whatfix.

68.     In the month before her departure from WalkMe, Ms. Frasca sent several emails from her WalkMe email account to her personal email account, attaching files containing confidential WalkMe information and materials.  An exemplary list of those files with descriptions thereof is included in Exhibit B.  Exhibit B, pages 1-3 (files corresponding to custodian: Kate Frasca).  These files include data showing the ███████████████████████, specific recently closed deals and forecasted revenue amounts for those deals, specific sales strategies and timelines for those strategies, and proprietary customer-facing materials with confidential information including granular information on the ████████████████████████ ████████████████████████████████████████████████████████.

*See, e.g.*, Exhibit B at page 1 (custodian: Kate Frasca, filename: "GTM DAP 4Q") and page 2 (custodian: Kate Frasca, filename: "WalkMe ████████████ v2").

69.     On information and belief, Ms. Frasca and Whatfix have used WalkMe's confidential information gathered and/or retained by Ms. Frasca to improve and develop Whatfix's sales strategies and customer-facing communications, including to specifically target WalkMe's existing customers.

70.     As another example, in November of 2023, Whatfix hired Mark Wilkin as an account executive in its enterprise sales department.  Before being hired by Whatfix, Mr. Wilkin was a Strategic Account Director at WalkMe.  On April 18, 2023, WalkMe informed Mr. Wilkin that his position was to be made redundant.  Within the next two weeks, Mr. Wilkin met with a recruiter for Whatfix.  During the same time period, Mr. Wilkin downloaded hundreds of files from WalkMe's system and attempted to download records of all WalkMe's open sales leads.   An exemplary list of those files with descriptions thereof is included in Exhibit B.  Exhibit B at pages 3-27 (files corresponding to custodian: Mark Wilkin).  Mr. Wilkin also sent numerous files from his WalkMe email account to his personal email account, including a file listing all the potential customers Mr. Wilkin was responsible for at WalkMe, ███████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████.  Exhibit B at page 26 (custodian: Mark Wilkin, filename: "Wilko Open Opps ███████████ ~ Salesforce - Unlimited Edition").

71.     On information and belief, Whatfix specifically targeted Mr. Wilkin for hiring in order to improperly gain access to WalkMe's confidential trade secret information, but at a minimum with knowledge of the fact that he possessed such information, and that such information could not properly be acquired by, used by or disclosed to anyone at Whatfix.

72.     On information and belief, Mr. Wilkin gathered WalkMe confidential information including WalkMe trade secrets, in anticipation of being hired at Whatfix.

73.     One of the files Mr. Wilkin downloaded from WalkMe's systems is a spreadsheet containing WalkMe confidential business information including the identity of specific WalkMe customers and their business type, number of employees, amount of revenue WalkMe earns from each, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████   Exhibit B at page 24 (custodian: Mark Wilkin, filename: "Territory - Accounts ver 1.0").

74.     The files Mr. Wilkin downloaded from WalkMe's system also include materials containing WalkMe's confidential pricing options including ██████████████████████

1

2    ███████████████████████████████████████████ . *See*, *e.g.*, Exhibit B at page 24

3    (custodian: Mark Wilkin, filename: "████████████ Proposal ████").

4        75.    On information and belief, Mr. Wilkin and Whatfix have used WalkMe's

5    confidential information gathered and/or retained by Mr. Wilkin to improve and inform Whatfix's

6    sales and pricing strategies, including to specifically target WalkMe's existing customers.

7        76.    All WalkMe employees, including Ms. Frasca and Mr. Wilkin, are subject to

8    confidentiality agreements that preclude them from disclosing or using WalkMe's confidential

9    information outside of the company, are trained on their confidentiality obligations at the time of

10    hire and are reminded of those obligations regularly.

11        77.    Ms. Frasca signed a Confidentiality and Proprietary Rights Agreement with

12    WalkMe on March 14, 2016, setting forth her obligations with respect to WalkMe's confidential

13    and proprietary information.  For example, Ms. Frasca explicitly agreed "not to directly or

14    indirectly disclose, publish, communicate or make available Confidential Information." Ms. Frasca

15    further agreed to, upon termination of her employment with WalkMe, "delete or destroy all copies

16    of any [confidential] documents and materials not returned to [WalkMe] … including those stored

17    on any non-[WalkMe] devices, networks, storage locations and media in [Ms. Frasca's] possession

18    or control."

19        78.    Mr. Wilkin's Letter of Offer, which he signed on August 24, 2021, similarly set

20    forth his obligations with respect to WalkMe's confidential and proprietary information.  For

21    example, Mr. Wilkin explicitly agreed not to "use or disclose [WalkMe business sensitive and

22    confidential information] unless authorised by the Company or as authorised by law" and to use

23    "best endeavors to keep secure all confidential or sensitive information" in his possession.  Mr.

24    Wilkin further agreed to, upon termination of his employment with WalkMe, "return … any

25    confidential and sensitive information, whether in physical or electronic form" in his possession

26    and control.

27        79.    Similarly, WalkMe's Employee Handbook provides that WalkMe employees are

28    required to "protect the confidentiality of Company trade secrets, proprietary information, and

confidential Company-related commercially sensitive information (e.g., financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) (collectively referred to as 'Confidential Information')." WalkMe's Employee Handbook further provides that, "[a]ccess to Confidential Information should be limited to a 'need to know' basis and should not be used for personal benefit, disclosed, or released without prior authorisation from a manager."

80.    As another example, in January of 2023, Whatfix hired ████████ as ████████ ████████████████████████████████. Before being hired by Whatfix, ████ was the ████████████████████████████ at ████, which is one of WalkMe's customers. At ████████ worked with WalkMe as part of her responsibilities.

81.    On information and belief, Whatfix specifically targeted ████████ for hiring in order to improperly gain access to WalkMe's trade secret information, but at a minimum with knowledge of the fact that she possessed such information, and that such information could not properly be acquired by, used by or disclosed to anyone at Whatfix.

82.    On information and belief, ████████ gathered WalkMe confidential information including WalkMe trade secrets in anticipation of being hired at Whatfix.

83.    Shortly before her departure from ████████ asked WalkMe to compile and provide a large amount of WalkMe confidential information. WalkMe provided the requested material, which demonstrates the specific way that WalkMe presents the capabilities and measure of value for its product to customers, including a detailed step-by-step example ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████; an example presentation showing ████████████████████████████████████████ ████████████████████████████████████. Exhibit B at pages 27-28 (custodian: ████████, filename: "Draft_████_WalkMe _Strategic Alignment and ████████ Overview.pptx").

84.    On information and belief, ████████ and Whatfix have used WalkMe's confidential information gathered and/or retained by ████████ to improve and inform Whatfix's

1   sales and product development strategies, including to specifically target WalkMe's existing

2   customers.

3       85.    WalkMe shares its confidential information with third parties including current and

4   potential customers only under confidentiality and other contractual restrictions commensurate

5   with its business needs.  For example, WalkMe's agreements with its customers contain provisions

6   protecting its confidential information, including by prohibiting customers from disclosing any

7   WalkMe confidential information or using WalkMe confidential information for purposes outside

8   of that contemplated in WalkMe's agreement with the customer.

9       86.    As a result of the above-described misappropriation, WalkMe has been harmed,

10  including by enabling Whatfix to improve its ability to compete with WalkMe to win customers by

11  using improperly obtained WalkMe confidential information including pricing information,

12  marketing information, sales materials, and confidential information about potential customers

13  Whatfix was otherwise unable to obtain; and to otherwise unfairly gain a competitive advantage.

14      **E.  Additional Facts Regarding Personal Jurisdiction**

15      87.    This Court has personal jurisdiction over Whatfix, Inc. because its principal place

16  of business is in San Jose, California.

17      88.    This Court has personal jurisdiction over both Defendants, including specifically

18  Defendant Whatfix PL, on the basis of at least the facts summarized below.  This Court has personal

19  jurisdiction pursuant to California Code of Civil Procedure section 410.10 because personal

20  jurisdiction is not inconsistent with the California or United States constitutions.

21      89.    Asserting jurisdiction over Whatfix PL comports with due process, including

22  notions of fair play and substantial justice.  Whatfix PL, directly and through its US subsidiary

23  Whatfix, Inc., carries out a large international business targeted toward customers in the United

24  States, California and this district, directly or indirectly employs staff in the United States,

25  California and this district, derives significant revenues and profits from its ongoing, regular

26  business in the United States, California and this district, and otherwise avails itself of the benefits

27  of the United States, California and this district such that jurisdiction here comports with due

28  process.  Whatfix PL has admitted that some of the conduct alleged here was carried out for the

purpose of winning customers in the United States and California, and/or assisting or supporting those customers.

90.     Whatfix, Inc. has represented in this action that the Whatfix.com website is owned and operated by Whatfix PL.  ("As the Whatfix.com website itself makes clear, '[t]he website is owned and operated by Whatfix Private Limited.'"  ECF No. 59 at 15).  A substantial part of this dispute arises out of statements made on the Whatfix.com website.  The website makes clear the breadth, depth and continuity of Whatfix PL's business in the United States, California and this district.  The website makes clear that Whatfix PL conducts ongoing business in the United States, including through the website, directs its relevant business to the United States, California and this district, seeks out business here, avails itself of the benefits of doing business here, and holds itself out as operating an established business here.  Though the website makes reference to "Whatfix," that term is expressly defined in the website's terms of service as referring to Whatfix PL: "The terms "Whatfix", "we", "us" or "our" shall mean Whatfix Private Limited." (https://whatfix.com/terms-of-service/).

91.     The front page of Whatfix.com includes a scrolling list of large United States corporations that appear to be Whatfix customers or partners, including companies like Cisco, which is headquartered in this district.  The website's claim that Whatfix is "Trusted By Enterprises Around the Globe" is illustrated by a map that highlights the United States:

SECOND AMENDED COMPLAINT
CASE No. 4:23-CV-03991-JSW



Trusted By Enterprises Across the Globe

92.     The website includes myriad press releases, making general reference to the business as "Whatfix," bearing the dateline "San Jose, Calif," or "San Jose, Calif. and Bangalore, India" (*see* https://whatfix.com/newsroom/). The website includes a privacy notice specifically tailored to California residents (https://whatfix.com/privacy-policy).

93.     Not only does the Whatfix.com website reflect the continuous and substantial nature of Whatfix's business here, the website itself is used to conduct that business.  The top of the front page allows users to click a "Get a Demo" button, which allows users to request a demonstration of the company's products.  (https://whatfix.com/request-demo/new/?utm_source=menu_&utm_medium=website&utm_content=demo).

94.     Jurisdiction here also comports with due process because Whatfix itself elects resolution of legal disputes in this district.  Whatfix's publicly available Master Service Agreement is governed by California law, and requires mandatory arbitration of any dispute in San Jose, California.  *See* whatfix.com/wp-content/uploads/2021/11/MSA-US-Clean-Template.docx.pdf at p. 9 (calling for resolution of disputes "exclusively by the Judicial Arbitration and Mediation Service by a single arbitrator in San Jose, California, United States.")  Other agreements published by Whatfix also contain terms subjecting them to California law and their parties to dispute

resolution in this district.  *See, e.g.*, Referral Agreement, https://whatfix.com/terms-of-agreement).

95.    Whatfix PL personally availed itself of California and directed to California the activity underlying these claims by engaging in the conduct described here, including intentionally accessing WalkMe's proprietary systems, confidential business information and trade secrets located in California, otherwise misappropriating WalkMe's trade secrets located in or directly relating to WalkMe's business in California, and targeting its false statements at California. Whatfix PL engaged in such contacts for the purpose of furthering its United States business, including specifically to win or assist the furtherance of its business with United States customers, including Customers X, Y and Z.  That business is carried out in California, including by Whatfix, Inc., which is headquartered in this district in San Jose, California and carries out the bulk of its United States business in California and in this district.

96.    Those and the other acts complained of here were intentional, expressly aimed at California, and caused harm that Whatfix PL and Defendants generally knew was likely to be suffered in California.  Such direction includes the fact that Whatfix PL's misappropriation and false advertising as described herein:

 a.  Were aimed at, intended to impact, and in fact impacted WalkMe's California- and district-based business.  As a publicly traded company and the leading company in the industry, the location of WalkMe's business in California is well known and readily ascertained.  Whatfix, Inc. is also located in this district, and the two directly compete for customers—including the very customers involved in these allegations—through their California business teams.  Whatfix's misappropriation and false advertising were expressly aimed at WalkMe's California business.

 b.  Were intended to and were in fact used to further Whatfix's United States business, including as described above on the Whatfix.com website owned and operated by Whatfix PL.

 c.  Were intended to and did in fact impact WalkMe's customer relationships that WalkMe entered into and maintained in California and this district.  Whatfix must have known that such business relationships were based in or maintained in California.

SECOND AMENDED COMPLAINT
CASE NO. 4:23-CV-03991-JSW

d. Caused resulting harm to WalkMe which occurred, and was known by Whatfix to have occurred, in this district and in California. Whatfix PL employees and agents through which the conduct was carried out must have known that the inevitable and direct impact of their misconduct would be on WalkMe's California business.

97. Furthermore, as alleged herein, at Whatfix's direction, numerous Whatfix employees or agents gained access to and used certain of WalkMe's software systems, albeit without authorization, and by doing so became subject to WalkMe's Terms of Service. WalkMe's Terms of Service contain the following forum selection and venue provision: "Any dispute arising out of or related to your use of the Service will be brought in, and you hereby consent to exclusive jurisdiction and venue in, the competent courts of the [sic] San Francisco County, California." Both Whatfix PL and Whatfix, Inc. are, as a result of the conduct of their employees and agents, therefore subject to the jurisdiction of this Court.

98. In the alternative, Whatfix PL is subject to jurisdiction upon service of the summons or waiver of service pursuant to Federal Rule of Civil Procedure 4(k)(2) if it is not subject to the jurisdiction of any state's courts of general jurisdiction because, for the reasons stated above, the exercise of jurisdiction comports with due process.

**F. Whatfix's False and Misleading Advertising**

99. Whatfix's unlawful conduct and unfair business practices extend to its product marketing and advertising. In attempting to lure potential customers to Whatfix and away from WalkMe, Whatfix disseminated false advertising claims that materially misstate the functionality and capabilities of WalkMe's digital adoption platform.

100. Whatfix has repeatedly engaged in this pattern of unlawful conduct and unfair business practices. WalkMe first notified Whatfix in 2018 of false and misleading statements made about WalkMe's products and services in the context of a "Whatfix Vs. WalkMe" comparative advertising chart published on Whatfix's website at that time. In response, Whatfix appeared to take at least some corrective action by removing from its webpages the false statements that WalkMe flagged.

101. More recently, on several Whatfix website URLs, including an entire webpage

dedicated to "Exploring WalkMe Alternatives and Competitors," Whatfix has published "Comparison Tables" that purport to identify common and differentiating product features and functionalities among industry competitors, including WalkMe and Whatfix.

102.    The "Comparison Tables" published on this webpage (and others) list a selective subset of product capabilities, which Whatfix posits to be material considerations for customers deciding between WalkMe or an alternative competitive digital adoption platform solution:

## WalkMe Competitors: Comparison Tables

Ultimately, choosing a WalkMe alternative comes down to comparing features and value for money and finding the best fit for your business.

To make your decision easier, we created comparison tables so you can easily see the differences between WalkMe and its top competitors.

103.    In its "Comparison Tables" (reproduced below), Whatfix falsely claims that WalkMe lacks certain functionalities (boxed in red) that Whatfix purports to provide:

| FEATURE | WALKME | WHATFIX | USERLANE | PENDO |
|---|---|---|---|---|
| Create in-app content such as guided product tours, walkthroughs, smart tips, task lists, and more. | ☑ | ☑ | ☑ | ☑ |
| Embed knowledge base wiki that link to external resources and track support question and search trends | ○ | ☑ | ○ | ○ |
| Directly integrates with your LMS | ☑ | ☑ | ☑ | ○ |
| SCORM compliant | ○ | ☑ | ○ | ○ |
| Autogenerate content into multiple formats and languages, as well as automatically pull in existing training content into your self-help wiki | ○ | ☑ | ○ | ○ |
| Collect feedback with in-app surveys | ☑ | ☑ | ☑ | ☑ |
| Communicate with users directly with in-app messaging | ○ | ☑ | ☑ | ☑ |
| Train users on mobile and web-based apps | ☑ | ☑ | ☑ | ☑ |
| Integrates directly with all major enterprise software vendors including Salesforce, SAP, Microsoft, and more | ☑ | ☑ | ☑ | ☑ |

SECOND AMENDED COMPLAINT
CASE NO. 4:23-CV-03991-JSW

104.    Contrary to Whatfix's claims, WalkMe's products can, and do, perform the capabilities that Whatfix asserts are missing.

105.    Whatfix's claim that WalkMe does not "[e]mbed [a] knowledge base wiki that links to external resources" is false.  WalkMe users can link to a wiki or knowledge base from within WalkMe. WalkMe supports a variety of knowledge base integrations, including but not limited to, Atlassian Confluence, Google Docs, and Microsoft Word.

106.    Whatfix's claim that WalkMe does not "track support question[s] and search trends" is false.  WalkMe tracks technical support questions through an efficient, user-friendly ticketing system.  Users can track their own cases, and customers can view all technical support cases associated with their account across all users. WalkMe's Insights Apps Pages provide detailed user metrics showing how users engage with WalkMe on a daily basis that include information gathered from tracking the number of searches users have initiated for common search terms.  WalkMe's Insights Apps Pages also track various other metrics including the total count of times any WalkMe Resource was viewed (including multiple views by the same user), the average number of Resource views per user, and the percentage of total users who viewed each Resource.

107.    Whatfix's claim that WalkMe is not "SCORM compliant" is false.  WalkMe is, in fact, SCORM compliant.  WalkMe users can export WalkMe training material in SCORM-compliant format.  WalkMe also supports a variety of other LMS formats, including TinCan, AICC, and xAPI.

108.    Whatfix's claim that WalkMe does not provide the ability to "[c]ommunicate with users directly with in-app messaging" is also false.  WalkMe enables direct communication with specific users through use of the WalkMe API to send users in-app messages. This allows WalkMe customers to send messages to users based on their profile, activity, or other criteria.

109.    As of the date of the original Complaint in this case, Whatfix had modified at least certain webpages to remove its false statement regarding "in-app messaging."  However, Whatfix has continued to make other false statements as described herein in its "Comparison Tables" and in various other competitive comparison literature and marketing materials published across Whatfix's website.

110.    WalkMe has been injured by Whatfix's false advertising, which impugns the industry-leading functionality and capabilities of WalkMe's product. Whatfix's false advertising has damaged WalkMe's goodwill, business reputation, and credibility in the trade. WalkMe is likely to continue to suffer irreparable injury until Whatfix's false advertising is stopped.

111.    In addition to harming WalkMe's reputation and commercial standing, Whatfix's false advertising has materially impacted customers' purchasing decisions. Whatfix's false statements regarding WalkMe's product have diverted to Whatfix sales that WalkMe otherwise would have made and have caused WalkMe monetary damage in the form of both lost sales and lost profits.

**FIRST CAUSE OF ACTION**
**(Misappropriation of Trade Secrets in Violation of the**
**Defend Trade Secrets Act, 18 U.S.C. § 1836 – Against All Defendants)**

112.    WalkMe repeats and realleges the previous paragraphs of the Complaint, as if set forth herein in full.

113.    As set forth above, Defendants have improperly and without WalkMe's consent accessed, acquired, remained in possession of, used, and/or disclosed certain confidential and proprietary information of WalkMe constituting "trade secrets" as defined by 18 U.S.C. § 1839(3). These trade secrets, as described above, are related to a product or service that is used in, that has been used in and/or that is intended for use in interstate and/or foreign commerce. WalkMe is the owner of such information. This information is integral to WalkMe's digital adoption platform software solutions and services, and is the result of extensive research, development and investment. These trade secrets were developed, compiled and enhanced over time by WalkMe employees.

114.    WalkMe has taken numerous, reasonable precautions to protect and to maintain the value of its trade secrets, including as set forth above.

115.    WalkMe's trade secrets derive actual or potential independent economic value from not being generally known to and not being readily ascertainable through proper means by any other person who can obtain economic value from the disclosure or use of the information.

116.    Such trade secrets are not accessible to the public and are not generally known within the trade or by special persons who are skilled in the trade, other than by those who are bound to maintain their secrecy and confidentiality.

117.    At all relevant times, Defendants knew or had reason to know that the trade secrets were improperly acquired and/or were subject to limitations on their use, which limitations were exceeded by Defendants.

118.    On information and belief, Whatfix Inc. has acquired WalkMe's trade secrets from Whatfix PL as part of the Whatfix digital adoption platform, knowing or having reason to know that Whatfix PL had acquired WalkMe trade secrets by improper means.

119.    On information and belief, Whatfix Inc. has marketed and sold access, licenses, and/or subscriptions to the Whatfix digital adoption platform, and/or has otherwise used the WalkMe trade secrets, knowing or having reason to know that the Whatfix digital adoption platform is derived from WalkMe trade secrets that Whatfix PL obtained by improper means.

120.    As a result of the above-described misappropriation, WalkMe has been harmed, including by enabling Whatfix to improve its ability to compete with WalkMe to win customers by using improperly obtained WalkMe information to inform the development of its own digital adoption platform, to save on research and development costs, and to otherwise unfairly gain a competitive advantage.

121.    As a direct and proximate result of Defendants' unlawful, tortious conduct, WalkMe has been damaged and Defendants have been unjustly enriched. The damage to WalkMe includes the loss of revenues from Whatfix's use of WalkMe's own trade secrets to compete with WalkMe for business and to offer services based on those trade secrets at a lower price. The unjust enrichment includes the profits Whatfix has obtained through its misappropriation of the trade secrets and the value attributed to the misappropriated information, including amounts Defendants saved in research and development costs using the misappropriated information and increased productivity from use of the misappropriated information.

122.    Defendants' conduct constitutes willful and malicious misappropriation within the meaning of the DTSA. In wrongfully and intentionally misappropriating WalkMe's trade secrets

as outlined above, Defendants have demonstrated specific intent to cause substantial injury or harm to WalkMe.  As such, WalkMe is entitled to an award of exemplary damages as well as an award of its reasonable attorneys' fees pursuant to the DTSA.

123.    Unless Defendants are enjoined from misappropriating WalkMe's trade secrets, WalkMe will suffer irreparable harm for which there is no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**(Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act, California Civil Code § 3426 *et seq.* – Against All Defendants)**

124.    WalkMe repeats and realleges the previous paragraphs of the Complaint, as if set forth herein in full.

125.    As set forth above, Defendants have improperly and without WalkMe's consent accessed, acquired, remained in possession of, used, and/or disclosed certain confidential and proprietary information of WalkMe constituting "trade secrets" as defined by Cal. Civ. Code § 3426 *et seq.*  WalkMe is the owner of these trade secrets.

126.    WalkMe has taken reasonable precautions to protect and to maintain the value of its trade secrets, including as described above.

127.    WalkMe's trade secrets derive actual or potential independent economic value from not being generally known to the public or to other persons who can obtain economic value from the disclosure or use of the information.

128.    On information and belief, Whatfix Inc. has acquired WalkMe's trade secrets from Whatfix PL as part of the Whatfix digital adoption platform, knowing or having reason to know that Whatfix PL had acquired WalkMe trade secrets by improper means.

129.    On information and belief, Whatfix Inc. has marketed and sold access, licenses, and/or subscriptions to the Whatfix digital adoption platform, and/or has otherwise used the WalkMe trade secrets, knowing or having reason to know that the Whatfix digital adoption platform is derived from WalkMe trade secrets that Whatfix PL obtained by improper means.

130.    As a result of the above-described misappropriation, WalkMe has been harmed, including by enabling Whatfix to improve its ability to compete with WalkMe to win customers by using improperly obtained WalkMe information to inform the development of its own digital

1   adoption platform, to save on research and development costs, and to otherwise unfairly gain a

2   competitive advantage.

3        131.    WalkMe has suffered and will continue to suffer damages and irreparable harm as a

4   direct and proximate result of Defendants' misappropriation of WalkMe's trade secrets.  As a direct

5   and proximate result of Defendants' misappropriation of WalkMe's trade secrets, Defendants have

6   been unjustly enriched and WalkMe has sustained damages in an amount to be proven at trial.

7        132.    Defendants' conduct is malicious, oppressive, and deceitful, justifying an award of

8   exemplary damages and attorneys' fees recovery.

9        133.    Unless Defendants are enjoined from misappropriating WalkMe's trade secrets,

10  WalkMe will suffer irreparable harm for which there is no adequate remedy at law.

11                     **THIRD CAUSE OF ACTION**
     **(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2) – Against All**
12                          **Defendants)**

13       134.    WalkMe repeats and realleges the previous paragraphs of the Complaint, as if set

14  forth herein in full.

15       135.    WalkMe's computers are "protected computers" under 18 U.S.C. § 1030(e)(2)(B)

16  because they are used in and affect interstate commerce or communication.

17       136.    As alleged above, on multiple occasions, Defendants accessed WalkMe's protected

18  computers without authorization and/or exceeded authorized access and thereby obtained protected

19  information from WalkMe's protected computers in violation of 18 U.S.C. § 1030(a)(2).

20       137.    Defendants' access to WalkMe's platform using WalkMe's customers' credentials

21  was without authorization and/or exceeded authorized use of the customers' credentials.

22       138.    On information and belief, Whatfix convinced WalkMe's customers to allow

23  Whatfix employees to use email addresses with the customers' domain names, so as to induce the

24  customers to unwittingly enable Whatfix to conceal its improper access to WalkMe's platform.

25       139.    On information and belief, Whatfix falsely told WalkMe's customers that it was

26  using the credentials solely for legitimate migration purposes, when in fact Whatfix intended to and

27  did use those credentials to improperly access WalkMe's trade secrets.

28       140.    Whatfix improperly accessed portions of WalkMe's software that it was not

authorized to access, including the dashboard which shows aggregated customer data of WalkMe Insights (accessed by Paula Prigge on April 28, 2023); the ShoutOut designer (accessed by Dipit Sharma on June 21, 2023); the ShoutOut Theme Gallery (accessed by Dipit Sharma on June 21, 2023); and the Selected Element tool (accessed by Priyansh Bhattacharya on March 31, 2023, as well as other individuals and access dates); among others.

141.    Further, on at least one occasion, an employee of Whatfix accessed WalkMe's protected computers after Whatfix's work with that customer had ended, at which point Whatfix was not authorized to access WalkMe's secure software platform for any reason.  For example, Whatfix's Dipit Sharma used customer credentials to access WalkMe's software after Whatfix's work with that customer had ended.

142.    Defendants' conduct as alleged herein has caused WalkMe to suffer damage and/or loss.  WalkMe has been damaged in excess of $5,000 during a one-year period by Defendants' unauthorized access, access in excess of authorization, and abuse of its protected computers. WalkMe employees have spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Defendants' actions.

143.    Defendants' actions have caused WalkMe to incur losses and other economic damages, including, among other things, the expenditure of resources to investigate and respond to Defendants' unauthorized access, access in excess of authorization, abuse of its protected computers, and lost sales.  WalkMe is entitled to be compensated for losses and damages in an amount to be determined at trial, and any other amount proven at trial.

144.    Defendants have caused irreparable and incalculable harm and injuries to WalkMe and unless enjoined, Defendants' conduct will cause further irreparable and incalculable injury for which WalkMe has no adequate remedy at law.

### FOURTH CAUSE OF ACTION
**(Violation of the California Computer Data Access and Fraud Act, California Penal Code § 502(c) – Against All Defendants)**

145.    WalkMe repeats and realleges the previous paragraphs of the Complaint, as if set forth herein in full.

146.    WalkMe maintains and is the owner and/or lessor of proprietary computers,

computer networks, computer systems, computer programs and/or data.

147.    Defendants knowingly and without permission accessed WalkMe's proprietary computers, computer networks, computer systems, computer programs, and/or data in violation of Cal. Pen. Code § 502(c)(2) by, for example, claiming Defendants' employees required access to WalkMe's secure software platform in order to facilitate customer migration so as to obtain access using WalkMe's customers' credentials.

148.    Defendant's conduct as alleged herein was a substantial factor in causing harm to WalkMe.

149.    The extent and amount of damage to WalkMe caused by Defendants' violations of Cal. Pen. Code § 502(c) will be proven at trial.

150.    Defendants have caused irreparable and incalculable harm and injuries to WalkMe and unless enjoined, Defendants' conduct will cause further irreparable and incalculable injury for which WalkMe has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### (Federal False Advertising in Violation of 15 U.S.C. § 1125(a) – Against All Defendants)

151.    WalkMe realleges and incorporates the previous paragraphs of this Complaint as though fully set forth herein.

152.    Defendants' false and misleading advertisements and statements constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

153.    Defendants have made and continue to make false and misleading statements of fact concerning WalkMe's product in Defendants' advertisements and marketing materials.

154.    Upon information and belief, Defendants' false statements have actually deceived or tended to deceive a substantial segment of the relevant consumers for the parties' competing digital adoption platforms.

155.    Upon information and belief, Defendants' false and/or misleading statements are material in that they have influenced or are likely to influence the purchasing decisions made by the relevant consumers for the parties' competing digital adoption platforms throughout the United States.

156. Defendants' false statements were and are made in interstate commerce.

157. WalkMe has suffered and will continue to suffer damage to its business reputation and goodwill as a result of Defendants' false advertising.

158. WalkMe has lost and will continue to lose sales, customers, and market share as a result of Defendants' false advertising.

159. WalkMe has suffered an irreparable injury and has no adequate remedy at law.

160. The balance of hardships favors granting WalkMe injunctive relief.

161. The public interest would be served by enjoining Defendants because it would, among other reasons, stop Defendants' false and misleading advertising and consumer deception from continuing.

### SIXTH CAUSE OF ACTION
#### (Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* – Against All Defendants)

162. WalkMe repeats and realleges the previous paragraphs of the Complaint as though fully set forth herein.

163. Defendants' false statements about WalkMe's product described herein constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

164. WalkMe has been and is likely to continue being injured as a result of Defendants' false advertising in the form of lost profits, loss of market share, loss of sales, and loss of reputation and goodwill, which damage and injury will continue if not enjoined.

165. By advertising with false statements about WalkMe's product, Defendants have engaged in unfair competition, including unfair, deceptive, untrue, or misleading advertising, in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

### SEVENTH CAUSE OF ACTION
#### (False Advertising in Violation of Cal. Bus. & Prof. Code § 17500 *et seq.* – Against All Defendants)

166. WalkMe repeats and realleges the previous paragraphs of this Complaint as though fully set forth herein.

167. Defendants' false statements about WalkMe's product described herein constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

168.    Defendants knew or should have known by the exercise of reasonable care that its advertising included false statements about WalkMe's product.

169.    WalkMe has been and is likely to continue being injured as a result of Defendants' false advertising in the form of lost profits, loss of market share, loss of sales, and loss of reputation and goodwill, which damage and injury will continue if not enjoined.

170.    By advertising with false statements about WalkMe's product, Defendants have engaged in unfair competition, including unfair, deceptive, untrue, or misleading advertising, in violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, WalkMe prays for judgment in its favor against Defendants as follows:

1.    Preliminary and permanent injunctive relief enjoining Defendants, and each of their respective agents, servants, employees, attorneys, representatives, and all others acting on their behalf or in concert with them:

a.    From further accessing WalkMe's proprietary digital adoption platform system without authorization;

b.    From otherwise further accessing, using, or disclosing WalkMe's trade secrets;

c.    To return and/or destroy all of WalkMe's trade secrets, any record or reflection thereof, and any information derived in whole or in part thereof;

d.    To place appropriate restrictions on personnel who have been exposed to any of WalkMe's trade secrets or information derived therefrom, including any involvement in product development or customer interactions;

e.    To identify and destroy any code (including any source code or operating code) that includes, was derived from, or the creation or modification of which was influenced in any way by the improper access of Whatfix to WalkMe's trade secrets, including any features or aspect thereof whose creation was aided or motivated by Whatfix's access to WalkMe's trade secrets;

f.    From making false or misleading statements complained of herein or otherwise; and

g.   Any other injunctive relief deemed appropriate by the Court;

2.    Compensation in an amount to be proven at trial, including but not limited to unjust enrichment, actual losses, lost profits, and/or imposition of a reasonable royalty;

3.    An order requiring Whatfix to account for all gains, profits, and advantage derived from its misappropriation of WalkMe's confidential, proprietary, and/or trade secret information;

4.    General and special damages according to proof, but in excess of the jurisdictional minimum of this Court;

5.    Compensatory, exemplary and punitive damages according to proof;

6.    Disgorgement of profits;

7.    Restitution;

8.    Pre-judgment and post-judgment interest;

9.    Costs of suit;

10.    Reasonable attorneys' fees incurred in prosecuting this action; and

11.    Such other and further relief as the Court deems just and proper.

Dated:  April 12, 2024                      KOBRE & KIM LLP

By:  */s/ Michael Ng*
Michael Ng (CA SBN 237915)
Michael.Ng@kobrekim.com
Daniel Zaheer (CA SBN 237118)
Daniel.Zaheer@kobrekim.com
Kim Kennedy (CA SBN 305499)
Kim.Kennedy@kobrekim.com
**KOBRE & KIM LLP**
150 California Street, 19th Floor
San Francisco, CA 94111
Telephone: (415) 582-4800
Fax: (415) 582-4811

James Pooley (Cal. State Bar No. 58041)
james@pooley.com
**JAMES POOLEY, PLC**
325 Sharon Park Dr., #208
Menlo Park, CA 94025
Telephone: (650) 285-8520

George Stamatopoulos (*admitted pro hac vice*)
George.Stamatopoulos@kobrekim.com
**KOBRE & KIM LLP**

1

800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Fax: (212) 488-1220

*Attorneys for Plaintiffs*
WALKME LTD., and WALKME INC.

1

## <u>DEMAND FOR JURY TRIAL</u>

2          Plaintiffs demand a trial by jury on all claims so triable.

3

4     Dated:  April 12, 2024                    KOBRE & KIM LLP

5                                          By:  */s/ Michael Ng*
                                               Michael Ng (CA SBN 237915)
6                                              Michael.Ng@kobrekim.com
                                               Daniel Zaheer (CA SBN 237118)
7                                              Daniel.Zaheer@kobrekim.com
                                               Kim Kennedy (CA SBN 305499)
8                                              Kim.Kennedy@kobrekim.com
                                               **KOBRE & KIM LLP**
9                                              150 California Street, 19th Floor
                                               San Francisco, CA 94111
10                                             Telephone: (415) 582-4800
                                               Fax: (415) 582-4811
11
                                               James Pooley (Cal. State Bar No. 58041)
12                                             james@pooley.com
                                               **JAMES POOLEY, PLC**
13                                             325 Sharon Park Dr., #208
                                               Menlo Park, CA 94025
14                                             Telephone: (650) 285-8520

15                                             George Stamatopoulos (*admitted pro hac vice*)
                                               George.Stamatopoulos@kobrekim.com
16                                             **KOBRE & KIM LLP**
                                               800 Third Avenue
17                                             New York, NY 10022
                                               Telephone: (212) 488-1200
18                                             Fax: (212) 488-1220

19                                             Shangxing (Simon) Lu
                                               (Admitted *Pro Hac Vice*)
20                                             Simon.Lu@kobrekim.com
                                               **KOBRE & KIM LLP**
21                                             1919 M Street NW
                                               Washington, DC 20036
22                                             Telephone: (202) 664 1900
                                               Fax: (202) 664 1920
23
                                               *Attorneys for Plaintiffs*
24                                             WALKME LTD., and WALKME INC.

25

26

27

28